**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JACQUELYN L., | ) |
| | ) |
| Plaintiff, | ) |
| | )    No. 24 C 5347 |
| v. | ) |
| | )    Judge Sara L. Ellis |
| FRANK BISIGNANO, | ) |
| Commissioner of the Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Jacquelyn L. seeks to overturn the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 [16]. The Commissioner has also moved for summary judgment, seeking affirmance of the Commissioner's denial [23]. Because the Administrative Law Judge ("ALJ") erred by failing to consider Jacquelyn L.'s mental limitations in her residual functional capacity ("RFC") assessment, giving significant weight to a medical expert's opinion that was formed without significant evidence from the case, and making improper conclusions without adequate reasoning in the subjective symptom assessment, the Court reverses the ALJ's decision, remands this case to the Social Security Administration ("SSA") for further proceedings consistent with this Opinion, and denies the Commissioner's motion for summary judgment [23].

## BACKGROUND

### I.    Medical History

In March 2015, when Jacquelyn L. was sixty-one years old, she went to an emergency room complaining of severe, sharp abdominal pain.  AR 463–64.  The treating physician diagnosed her with diverticulitis.  AR 463–68, 474.  In July 2016, Jacquelyn L. returned to the emergency room.  AR 439.  She reported diffuse abdominal pain, bloody stools, and rectal bleeding that had begun in April 2016.  AR 439, 444–45.  Physicians performed a colonoscopy and found a large obstructing mass, noting that the colonoscopy scope could not pass beyond the mass.  AR 444.  Jacquelyn L. also told her doctors that she had been experiencing issues with diarrhea and bloody stool for approximately one year, but had not pursued treatment previously due to losing her insurance coverage and her responsibilities caring for her six-year-old grandchild.  AR 444, 446.  Doctors also noted Jacquelyn L. had hypertension and Chronic Obstructive Pulmonary Disease ("COPD").  AR 438, 450.  Ultimately, treating physicians diagnosed Jacquelyn L. with T3N0 rectal cancer, stage IIA.  AR 432, 485, 541, 543.

In July 2016, Jacquelyn L. met for an initial consultation with Dr. Leela N. Rao concerning her rectal cancer.  AR 508.  Jacquelyn L.'s PET CT showed a four-centimeter tumor and near-complete obstruction.  *Id.*  Dr. Rao noted that Jacquelyn L. also appeared nervous.  AR 508–09.  Jacquelyn L. then consulted with radiation oncologist Kapila Kalakota, who recommended that Jacquelyn L. undergo concurrent chemoradiation therapy to help downsize the tumor.  AR 541, 543.  Dr. Kalakota noted that the chemoradiation would be Monday through Friday for approximately five and a half weeks.  AR 543.  Jacquelyn L. underwent her chemoradiation therapy from August 4, 2016, to September 29, 2016.  AR 543, 620, 797.

Three days after starting her chemoradiation therapy, Jacquelyn L. went to an emergency room with abdominal pain, constipation, and vomiting. AR 620. Her medical providers temporarily stopped her chemoradiation therapy. AR 1018. She underwent a diverting loop colostomy[1] surgery, which required a several days stay in the hospital. AR 628, 631, 1018.

While Jacquelyn L. underwent treatment, Dr. Rao noted that Jacquelyn L. lost weight such that he needed to supplement her diet with nutritional supplements. AR 1018. Further, Dr. Rao found that Jacquelyn L. was unable to drive and needed to arrange transportation. Id. Also, during this time period, Jacquelyn L. started receiving home health services and mental health counseling. AR 1018, 1101–23. Jacquelyn L.'s mental health counselor, Karla Schwartz, M.S.W., diagnosed Jacquelyn L. with major depressive disorder that was recurrent and moderate. Id. Additionally, Ms. Schwartz found that Jacquelyn L. required assistance with activities of daily living, including meal preparation, shopping, household chores, and transportation. Id.

In December 2016, Jacquelyn L. underwent an exploratory laparotomy and resection of the rectal cancer. AR 711, 960, 1018. Jacquelyn L.'s surgery required her to stay in the hospital for several days and then recover for several weeks. AR 1018. In a report written shortly before Jacquelyn L.'s surgery, Dr. Rao observed that Jacquelyn L. had some mild paresthesia in the perineal area, Jacquelyn L.'s weight had stabilized, and that Jacquelyn L. was slightly anemic. AR 680. At that time, Dr. Rao noted that Jacquelyn L. could not perform any physically strenuous activity, but was ambulatory and able to carry out light or sedentary work. AR 681.

---

[1] A loop colostomy diverts the colon to an artificial opening in the abdomen, called a stoma, where waste then exits the body into a bag. See Loop Colostomy, Cleveland Clinic (Jan. 10, 2023), https://my.clevelandclinic.org/health/treatments/24589-loop-colostomy; Types of Colostomies and What to Expect, American Cancer Society (July 1, 2025), https://www.cancer.org/cancer/managing-cancer/treatment-types/surgery/ostomies/colostomy/types-of-colostomies.html#:~:text=care%20for%20it%20.-,Closing%20or%20reversing%20a%20colostomy,up%20during%20or%20after%20surgery.

3

Also, in December 2016, as part of the SSA's denial of Jacquelyn L.'s initial DIB application, Dr. Charles Kenney completed a medical evaluation of some of Jacquelyn L.'s medical records. AR 100–01. Specifically, Dr. Kenney found that Jacquelyn L. had two medically determinable impairments ("MDI") that were "Colon, Rectum or Anus, Malignant Neoplasm" and "Essential Hypertension." AR 101. However, these MDIs were "not, or will not be, of such severity so as to prevent, or to have prevented, the individual from engaging in [Substantial Gainful Activity] within twelve months after onset." *Id.* Also, Dr. Kenney evaluated Jacquelyn L.'s claims of pain to only be "partially consistent" with the evidence in her file because "she state[d] she can only walk ½ of a block before needing to stop and rest" but "the severity of limitations that she alleges is not consistent with what the objective evidence in the file indicates." AR 101–02.

In January 2017, Dr. Rao wrote that although Jacquelyn L.'s surgical wound had healed, Jacquelyn L. still reported pain in her pelvis and perineum. AR 795. Further, Dr. Rao noted that Jacquelyn L. had lost weight, felt depressed, and an accident with her colostomy bag upset her. *Id.* Dr. Rao also found that, while Jacquelyn L. was capable of self-care, she was unable to perform any work activities. AR 796. Dr. Rao prescribed Jacquelyn L. Wellbutrin for her depression. AR 797. In a separate note from later in January 2017, Rao wrote that Jacquelyn L. could not perform physically strenuous activity, but could carry out light or sedentary work. AR 811. Jacquelyn L. also began another course of chemotherapy, which Dr. Rao scheduled to continue for six months. AR 843, 1018.

In February 2017, Jacquelyn L. reported to Dr. Rao that she was feeling very down and was experiencing nausea. AR 828. Further, Dr. Rao observed that the events of the past year had weakened Jacquelyn L., and she was unable to work. AR 1018–19. Dr. Rao wrote that

Jacquelyn L. was not able to perform any work activities, and predicted that Jacquelyn L. would not be able to return to work until September 2017 at the earliest because of her continued treatment and recovery. AR 825, 1019. Jacquelyn L. also told Ms. Schwartz that she was experiencing several side effects from chemotherapy. AR 1119.

Over the next few months, Jacquelyn L.'s experience on the chemotherapy varied. AR 868–69. At times, she reported that she could eat more and that she was tolerating the chemotherapy better. *Id.* At others, she reported having a hard time with the chemotherapy and experiencing continued perineal pain, nausea, and paresthesia. *Id.* Dr. Rao diagnosed Jacquelyn L. with drug-induced polyneuropathy in June 2017. AR 872. Further, during this time period, Dr. Rao sometimes expressly noted that Jacquelyn L. could not perform work, but other times noted that she could perform light or sedentary work. AR 875, 880, 885, 900. Jacquelyn L. received her final chemotherapy treatment of her second round of chemotherapy in July 2017. AR 869.

Also, in February and March 2017, as part of the SSA's explanation of why it had denied reconsideration of Jacquelyn L.'s DIB application, Calixto Aquino, MD and Lionel Hudspeth, PsyD assessed some of Jacquelyn L.'s medical records. AR 112-18. They found that Jacquelyn L. had three MDIs. AR 113. They noted "Colon, Rectum or Anus, Malignant Neoplasm" and "Essential Hypertension" as non-severe, and "Depressive, Bipolar and Related Disorders" as severe. *Id*. Dr. Aquino also filled out a RFC assessment, wherein he found that Jacquelyn L. could occasionally lift fifty founds, frequently lift twenty-five pounds, stand six hours a workday, sit six hours a workday, and operate hand or foot controls. AR 115. He also found that Jacquelyn L. did not have postural, manipulative, visual, communicative, or environmental limitations. AR 115–16. Additionally, he found that Jacquelyn L.'s alleged pain was only

partially consistent with the evidence in the file because her claim that she could only walk half a block before needing to rest was not consistent with what the file indicated. AR 114. The SSA's explanation also included a "medical opinion" from Dr. Rao, which stated she did not expect Jacquelyn L. "to be able to go back to work or perform until at least 9/2017" and "[f]rom the details described above, it should be evident that [Jacquelyn L.] is not able to hold a job or work until her cancer is treated and the point is that she does have a curable rectal [sic] once she ha [sic] completed the treatment." AR 107.

In August 2017, Jacquelyn L. began receiving counseling from a new social worker, Noel Bueno, L.C.S.W. AR 1200. He observed that her major depressive disorder was worse and that she reported "I feel depressed all the time and don't have any motivation to do things." *Id.*

On September 1, 2017, Jacquelyn L. underwent a reversal of her loop colostomy. AR 1131. She stayed in the hospital for several days following this procedure. AR 1131–40. Following the surgery, Dr. Rao noted that Jacquelyn L. was healing well, but suffering from neuropathy that was causing her to drop objects, leaving Jacquelyn L. "very depressed and tearful." AR 1224. Dr. Rao also wrote that Jacquelyn L. was "stressed because she is scheduled to return to work and feels she cannot handle it." AR 1820.

On September 21, 2017, Dr. Rao filled out a form regarding Jacquelyn L.'s DIB claim. AR 902–03. On the form, Dr. Rao checked the box for Jacquelyn L. being unable to perform full-time competitive work. AR 903. Dr. Rao circled symptoms that indicated that Jacquelyn L. still experienced fatigue, pain, neuropathy, and mental fogginess. AR 902. Dr. Rao also circled the option "no," indicating that Jacquelyn L. had not been able to perform full-time work since June 2016. *Id.*

On October 12, 2017, Jacquelyn L. testified at the first hearing on her DIB claim before the ALJ.  AR 59-83.  Jacquelyn L. testified about her employment history.  AR 60–65.  Jacquelyn L. explained that she worked as a program director until 2009, and then took a variety of temp jobs.  AR 60–61.  When the ALJ asked Jacquelyn L. why she was unable to work now, Jacquelyn L. explained that she was experiencing numbness in her hands and feet that was irritating, pain when attempting to defecate, and depression.  AR 65–67.  Jacquelyn L. also described her experience with a colostomy bag as a "nightmare," explaining that she would have frequent accidents where the bag would leak.  AR 78.  Additionally, Jacquelyn L. told the ALJ she had a "homemaker" who made Jacquelyn L.'s meals, cleaned her home, and did her laundry.  AR 79.  Jacquelyn L. explained that due to her health, she had issues with daily tasks.  AR 79-83.  For example, she could not walk downstairs without taking a break, could not drive due to the numbness in her feet making it difficult for her to feel the pedals, and needed to use two hands to drink a cup of coffee because she had issues with dropping items.  AR 79–81.

In October 2017, Jacquelyn L. had a post-operative appointment with certified physician's assistant Kelsey Elisabeth.  AR 1128–30.  Ms. Elisabeth noted that Jacquelyn L.'s incision was healing well, although Jacquelyn L. reported intermittent constipation alternating with loose stool when Jacquelyn L. took laxatives.  AR 1129.  Jacquelyn L. also complained of generalized tiredness and fatigue.  *Id.*  Jacquelyn L. began B12 injections that continued through to January 2018.  AR 1820.  During this time period, Dr. Rao noted that Jacquelyn L. reported significant home stresses, although did not document details about these stresses beyond saying "social issues are getting her down" and "[f]inancially aslo [*sic*] it is hard as she cannot work."  *Id.*  In this same month, Jacquelyn L.'s counselor Mr. Bueno observed that Jacquelyn L.

"identified having a decrease in stress level, more motivation to engage in new activities" and classified Jacquelyn L.'s major depressive disorder as "Better." AR 1212.

In June 2019, a CT scan revealed a nodule in Jacquelyn L.'s right lung, which a biopsy later revealed to be lung cancer. AR 1899. Jacquelyn L. underwent a right upper lobectomy surgery in November 2019. AR 1899. After her surgery, Jacquelyn L. reported that she was experiencing some pain in her chest. AR 1965. Jacquelyn L. also told her doctors that she was working as a lunch lady for a school, but had been off work for her surgery. *Id.*

In the spring of 2020, Jacquelyn L. reported to her doctors that she developed shortness of breath. AR 2248. A pulmonologist began working with Jacquelyn L., but the COVID-19 pandemic delayed Jacquelyn L.'s treatments. *Id.* Jacquelyn L.'s doctors also noted that she had been working in an Amazon warehouse, but felt that she felt short of breath easily. *Id.*

In February 2023, Jacquelyn L. testified at her second DIB hearing before the ALJ. AR 1270–1293. Jacquelyn L. explained that she had gone back to work off and on as a lunch lady. AR 1271. She was also providing care for her son, although she was not able to lift over twenty pounds. AR 1273. Jacquelyn L. explained that she was not able to work from 2015 to 2019 because she had colorectal cancer, necessitating chemotherapy, radiation, and surgery, and then lung cancer. AR 1273–74. Specifically, Jacquelyn L. said she could not control her bowels, had issues with weakness in her hands, was unable to lift or hold onto items, and was not able to differentiate between gas and brake petals with her feet. AR 1274. She also said that chemotherapy made her tired and nauseous. AR 1290. Further, she could only stand for fifteen to twenty minutes, walk half a block, and could not lift much weight at all. AR 1278-79. Jacquelyn L. also again described her challenges with her colostomy bag and depression. AR 1288-91.

Also at the February 2023 hearing, vocational expert named Lanelle Yamane testified. AR 1293–1305. Yamane testified that she had read and listened to Jacquelyn L.'s work history. AR 1294. The ALJ asked Yamane to classify the work that Jacquelyn L. performed caring for her son, as part of "Trinity Care Providers," which Yamane classified as "Companion, 309.677-010". AR 1294–95. Yamane also named two "composite" jobs based on Jacquelyn L.'s work history, which were "child welfare case worker" and "case worker, supervisor." AR 1295–96. Further, Yamane classified other work from Jacquelyn L.'s work history as "stores laborer," "registration clerk," "telephone answering service operator," and "survey worker." AR 1296–98.

## II.    Procedural History

On July 8, 2016, Jacquelyn L. applied for DIB. AR 104, 123. Jacquelyn L. initially claimed that her disability began January 1, 2015[2], but later amended her alleged disability onset date to April 1, 2016. AR 106, 220. On December 21, 2016, the SSA denied her DIB application. AR 102, 139. Jacquelyn L. requested reconsideration shortly thereafter, and the SSA denied that request on March 14, 2017. AR 144–46. Jacquelyn L. then requested a hearing on her DIB application before an ALJ. AR 164–66.

On October 12, 2017, Jacquelyn L. testified at the hearing regarding her DIB application before ALJ. AR 50–95. On May 22, 2018, the ALJ issued a written opinion, finding that Jacquelyn L. did not qualify as disabled under §§ 216(i) and 223(d) of the Social Security Act. AR 123–30. Jacquelyn L. requested that the Appeals Council review the ALJ's opinion and the Appeals Council denied Jacquelyn L.'s request for review. AR 1–7. Jacquelyn L. then filed an action for judicial review of the SSA's denial in this District on June 24, 2019. AR 1331–35.

---

[2] The Court notes that multiple documents in the record state that the initial date Jacquelyn L. claimed she became unable to work due to her disability was January 1, 2015. *See* AR 106, 145, 201, 251. But other documents and Jacquelyn L.'s own brief state that it was January 1, 2016. *See* AR 123; Doc. 16 at 1. The Court finds that this distinction is not important because Jacquelyn L. amended her alleged onset date to April 1, 2016. AR 220.

On May 23, 2022, the court granted Jacquelyn L.'s motion to remand and denied the Commissioner's motion to affirm. AR 1355. The court found that substantial evidence did not support the ALJ's decision. AR 1350. Specifically, the court found that the ALJ did not adequately articulate reasons for giving Dr. Rao's opinion little weight, did not sufficiently explain her finding of Jacquelyn L.'s RFC, and misconstrued the timeline of Jacquelyn L.'s symptoms and treatment. AR 1351–55.

Following the court's remand, on February 23, 2023, the ALJ held another hearing on Jacquelyn L.'s claim. Jacquelyn L. and Lanelle Yamane testified at the hearing. AR 1262–1305. The ALJ issued her second written opinion on May 20, 2023. The ALJ again found that Jacquelyn L. was not disabled under §§ 216(i) and 223(d) of the Social Security Act. AR 1251. Jacquelyn L. submitted written exceptions to the ALJ's opinion to the SSA Appeals Council, which again declined review of Jacquelyn L.'s claim on May 2, 2024. AR 1229-34.

### III. The ALJ's May 2023 Decision

To begin, the ALJ found that Jacquelyn L. met the insured status requirements of the SSA and had not engaged in substantial gainful activity ("SGA") during the period between April 1, 2016, and March 31, 2019. AR 1242. Then, the ALJ found that Jacquelyn L. had severe impairments of colon cancer and COPD, and non-severe impairments of hypertension, lung cancer, emphysema, osteopenia, deep vein thrombosis, iron deficiency, anemia, and acute cervical adenitis. AR 1242–43. Further, the ALJ found that Jacquelyn L.'s depression was also non-severe because it "did not cause more than minimal limitation to the claimant's ability to perform basic mental work activities." AR 1243. Specifically, the ALJ evaluated the severity of Jacquelyn L.'s mental impairments using the four functional areas set forth in section 12.00 of the Listing of Impairments, *i.e.*, the paragraph B criteria, finding that Jacquelyn L. had no

10

limitations in the understanding, remembering, or applying information area and concentrating, persisting, or maintaining pace area, but had mild limitations in the interacting with others area and adapting or managing oneself area. AR 1243–44. The ALJ reasoned that most of Jacquelyn L.'s stress was "situational and stemmed from caring for her young granddaughter," her medical records indicated that Jacquelyn L.'s mental health medication was helpful, Jacquelyn L. was not on active medication or under the care of a psychiatrist, and she had engaged in some work activity in 2019. AR 1243. The ALJ also noted that her review of the paragraph B criteria was "not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3" and that "[t]he following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." AR 1244.

Next, the ALJ found that Jacquelyn L. did not have any impairment or combination of impairments that met or equaled any of the listed impairments in 20 C.F.R. Par 404, Subpart P, Appendix 1. AR 1245. Further, after reviewing the record, the ALJ found that Jacquelyn L. had the RFC to:

> [P]erform light work as defined in 20 C.F.R. 404.1567(b) except she can lift/carry 20 pounds occasionally and 10 pounds frequently; frequently operate foot controls bilaterally; frequently operate hand controls bilaterally; frequently handle, finger, and feel items bilaterally; occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; occasionally work around moving mechanical parts; frequently operate a motor vehicle; and occasionally work in extreme cold or extreme heat.

AR 1245. To reach this conclusion, the ALJ conducted an analysis of whether the evidence could support that Jacquelyn L. had a medically determinable physical or mental impairment that caused her alleged symptoms. AR 1245–50. After conducting this analysis, the ALJ found that Jacquelyn L.'s "medically determinable impairments could reasonably be expected to cause the

11

alleged symptoms" but that Jacquelyn L.'s claims regarding the "intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the" evidence. AR 1246. The ALJ described Jacquelyn L.'s history with colon cancer and treatment, stating that "[t]he claimant's symptoms did not begin consistently until well into 2016 per her own reporting." AR 1246–47. The ALJ also noted that Jacquelyn L. testified that she had issues with her colostomy bag but found that these issues were "not consistently noted in the record" and that Jacquelyn L. had a caregiver during the relevant time period but found that "there is no objective documentation of this that would indicate severe and ongoing functional limitations." AR 1247. Then, the ALJ discussed Jacquelyn L.'s COPD history, noting that "[d]espite her pulmonary condition, the claimant was still able to smoke cigarettes." AR 1247-48. Further, the ALJ found that other evidence in the record was "inconsistent with the claimant's alleged restricted functioning" noting that Jacquelyn L. worked part-time as a lunch lady in 2019; was the guardian and caregiver for her granddaughter throughout the relevant time period; her job as a daycare director ended in 2009 due to the daycare program ending, not Jacquelyn L.'s functional challenges; and Jacquelyn L. was caring for her son in hospice in 2023. AR 1248. The ALJ also emphasized Dr. Rao's notes that Jacquelyn L. could perform light or sedentary work, and that Jacquelyn L. reported fewer side effects and had largely normal examinations at certain time periods. AR 1249.

Further, the ALJ reviewed the opinions of Dr. Rao, Dr. Kenney, Dr. Aquino, Dr. Hudspeth, and Mr. Bueno. AR 1249-50. The ALJ gave "little weight" to Dr. Kenney and Dr. Aquino's opinions because the longitudinal evidence in the record contravened their opinions. AR 1249. The ALJ gave Dr. Hudspeth's opinion that Jacquelyn L. did not have a severe mental impairment "significant weight" as she found it consistent with Jacquelyn L.'s own reported

12

functioning, noting again that "claimant served as the primary caregiver for her grandchild during the relevant period." *Id.* Next, the ALJ gave mixed weight to evidence from Dr. Rao, finding that Dr. Rao's opinion that Jacquelyn L. could not work was worth "no weight" because it was "conclusory and failed to provide a function-by-function analysis of the claimant's ability to work" and the ALJ felt that Dr. Rao's opinion conflicted with her notes in Jacquelyn L.'s medical records, including when Dr. Rao noted that Jacquelyn L. could perform light or sedentary work. AR 1249–50. However, the ALJ found that Dr. Rao's notes that Jacquelyn L. could perform light or sedentary work, and that Jacquelyn L. could not work until September 2017, were worth "moderate weight" as they indicated that Jacquelyn L. could perform some work and could perform work after September 2017. AR 1250. Finally, the ALJ assigned Mr. Bueno's opinion "no weight" as his statement did not discuss any of Jacquelyn L.'s functional limitations. *Id.*

Ultimately, the ALJ found Jacquelyn L. "was capable of performing past relevant work as a registration clerk and survey worker, as well as a composite job as a child welfare case worker and a case worker supervisor." *Id.* The ALJ reached this conclusion through reviewing Jacquelyn L.'s previous work experience, including her previous work as a registration clerk, survey worker, and a composite job of case worker supervisor and child welfare case worker. AR 1250–51.

## LEGAL STANDARD

### I. Standard of Review

In reviewing the denial of disability benefits, the Court "will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence." *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013). Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Although the Court reviews the entire record, it does not displace the ALJ's judgment by reweighing facts or making independent credibility determinations. *Beardsley v. Colvin*, 758 F.3d 834, 836–37 (7th Cir. 2014). But the Court may reverse and remand the ALJ's decision if the ALJ committed an error of law or based her decision on serious factual mistakes or omissions. *Id.* at 837. The Court also looks to "whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ "need not provide a complete written evaluation of every piece of testimony and evidence," *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (citation omitted), but "[i]f a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required," *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citation omitted).

## II. Disability Standard

To qualify for DIB, a claimant must show that she is disabled, meaning that she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Weatherbee v. Astrue*, 649 F.3d 565, 568 (7th Cir. 2011). To determine whether a claimant is disabled, the SSA uses a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4); *Kastner*, 697 F.3d at 646. At step one, the ALJ determines whether the claimant has engaged in substantial gainful activity during the relevant period. *See* 20 C.F.R. § 404.1520(a)(4)(i). At

step two, the ALJ considers whether the claimant's impairments are severe and meet the twelve-month durational requirement. *Id.* §§ 404.1509, 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant's impairment(s) meet or equal an impairment listed in the Social Security regulations. *Id.* § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404, Subpt. P, App'x 1. If the claimant's impairment(s) meet or equal a listing and meet the duration requirement, the claimant is disabled; if not, the analysis continues, and the ALJ assesses the claimant's RFC. 20 C.F.R. § 404.1520(a)(4)(iii), (e). At step four, the ALJ considers the claimant's RFC and determines whether the claimant can perform past relevant work. *Id.* § 404.1520(a)(4)(iv). If the claimant can perform past relevant work, she is not disabled. *Id.* If she cannot, the ALJ proceeds to step five, where the ALJ determines whether a substantial number of jobs exist that the claimant can perform given his RFC, age, education, and work experience. *Id.* §§ 404.1520(a)(4)(v), 404.1560(c). If the claimant can perform other work, she is not disabled; if he cannot perform other work, she is disabled. *Id.* § 404.1520(a)(4)(v). The claimant bears the burden of proof at steps one through four, and the burden shifts to the government at step five. *Weatherbee*, 649 F.3d at 569.

## ANALYSIS

In seeking to overturn the ALJ's decision, Jacquelyn L. argues that the ALJ committed reversible error by erroneously assessing her subjective symptoms, disregarding the medical opinions in the record, and failing to incorporate or address Jacquelyn L.'s mental impairments in the RFC. The Court addresses each argument in turn.

## I.     Subjective Symptom Assessment

Jacquelyn L. raises several issues with certain findings or statements that the ALJ made in her subjective symptom assessment, arguing that the evidence disproves them or that the ALJ

did not discuss certain contravening evidence in the record. The Commissioner responds that Jacquelyn L. ignores the ALJ's main points, misrepresents the ALJ's statements, nitpicks the ALJ's opinion, and asks the Court to reweigh the evidence. The Court finds that the ALJ's analysis contains reversible errors, because the ALJ gave improper weight to Jacquelyn L. being able to provide childcare and continuing to smoke cigarettes, without adequate explanation.

The ALJ must, pursuant to Social Security Ruling 16-3p, engage in a two-part analysis for symptom evaluation. SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017); *see also* 20 C.F.R. § 404.1529. First, the ALJ determines whether the claimant has an "underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." SSR 16-3p, 2017 WL 5180304, at \*3. If so, the ALJ "evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities for an adult." *Id.* At step two, the ALJ "examine[s] the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at \*5. The Court reviews the ALJ's assessment of a claimant's subjective symptoms with "special deference" and will overturn it only if "patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017). A decision is "patently wrong" "when the ALJ's determination lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008) (citation omitted).

Here, the ALJ reasoned that while Jacquelyn L.'s medically determinable impairments could reasonably be expected to cause the alleged symptoms, Jacquelyn L.'s statements about the intensity, persistence and limiting effects of the symptoms were not entirely consistent with

the medical evidence.  AR 1246.  The ALJ discussed Jacquelyn L.'s treatment history and the medical evidence of symptoms from throughout Jacquelyn L.'s colon cancer treatment, including Jacquelyn L.'s reports of pain, rectal bleeding, balance issues, paresthesia, nausea, and fatigue. The ALJ looked at Jacquelyn L.'s own reports at times denying pain, nausea, diarrhea, or other symptoms; medical treaters' physical evaluations of Jacquelyn L. finding she possessed a normal range of motion and gait; that Jacquelyn L. provided care for her granddaughter and son; that providers prescribed Jacquelyn L. Imodium to treat her diarrhea, and Jacquelyn L. never sought other medication; that providers prescribed Jacquelyn L. gabapentin to address her paresthesia, and the record does not indicate that Jacquelyn L. sought other treatment; that Dr. Rao noted at times that Jacquelyn L. could perform light or sedentary work; that Jacquelyn L.'s COPD did not require emergent treatment and Jacquelyn L. continued to smoke; and that Jacquelyn L. was able to secure a job as a lunch lady in 2019.  AR 1246–48.

Jacquelyn L. argues that the ALJ's opinion was not well reasoned because it contained some statements that could be inaccurate or errors, such as the ALJ's statement that "claimant's symptoms did not begin consistently until well into 2016 per her own reporting," "her June 2016 abdominal/pelvic CT was relatively normal," or that "there is no indication that . . . she experienced barriers to care as she had consistent treatment."  AR 1246.  While there is evidence in the record that certainly could indicate that Jacquelyn L. experienced symptoms for approximately a year before June 2016, she had an abnormal CT around June 2016, and that she faced barriers to care, there is also some contrasting evidence.  *See, e.g.*, AR 446 (noting that Jacquelyn L. stated that she had experienced bloody stools and diarrhea for approximately one year and that she had delayed treatment due to losing her insurance); AR 508 (describing a PET CT Jacquelyn L. received in July 2016 showing a 4cm tumor, and stating Jacquelyn L. had not

sought treatment for her symptoms previously because she had lost her insurance); AR 613

(describing a CT in June 2016 and not mentioning seeing any tumor in that specific CT scan);

AR 439 (noting that Jacquelyn L. reported that her abdominal pain and rectal bleeding began in

April 2016); AR 570–75 (records indicating that Jacquelyn L. received non-emergent medical

treatment from providers in December 2015, February 2016, and June 2016).  The Court cannot

reweigh the ALJ's determinations.  *See Tutwiler v. Kijakazi*, 87 F.4th 853, 859 (7th Cir. 2023)

("[J]udicial review is not designed for []judges looking at a transcript to re-weigh conflicting

evidence.").

Further, Jacquelyn L. argues that the ALJ improperly focused on April 2017 to find that

her symptoms lasted less than a year, when her chemotherapy ended in July 2017.  However, the

ALJ simply noted that in April 2017, Jacquelyn L. reported fewer issues than she had previously

with chemotherapy.  AR 1246.  The ALJ went on to acknowledge that Jacquelyn L.'s

chemotherapy continued until July 2017 and Jacquelyn L. received additional treatment after

then.  AR 1247.

Jacquelyn L. also takes issue with the ALJ's finding that Jacquelyn L.'s alleged issues

with her colonoscopy bag were not consistently in the record and that "the ALJ finds no support

for the fact that Jacquelyn L. had a caregiver."  Doc. 16 at 11.  However, much of the evidence

that Jacquelyn L. points to, including Jacquelyn L.'s testimony regarding her issues with her

colostomy bag, that Jacquelyn L. needed a colostomy in August 2016, and that Jacquelyn L.

received a colostomy reversal in September 2017, are all expressly discussed in the ALJ's

opinion.  AR 1246-47.  The ALJ did not need to mention every incident involving the colostomy

bag in the record, and the record does not clearly refute the ALJ's conclusion that evidence did

not support the extent of the challenges that Jacquelyn L. alleged that the colostomy bag caused

18

her. *See Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024) ("An ALJ need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning."). Additionally, the text of the ALJ's opinion did not state that Jacquelyn L. did not have a caregiver; rather, the ALJ found that there was no evidence in the record to support that Jacquelyn L. having a caregiver meant that Jacquelyn L. could not perform work-related tasks. *See* AR 1247. While the ALJ's opinion would have undoubtedly been strengthened if she had addressed why Jacquelyn L. having a caregiver did not suggest work-related functional limitations for Jacquelyn L. related to her ability to perform light work, the ALJ did not entirely ignore that Jacquelyn L. had a caregiver. *See Walcott v. Berryhill*, No. 18 C 988, 2019 WL 2494165, at *8 (S.D. Ind. Feb. 5, 2019) ("Even if this court were to hold that the ALJ should have expressly addressed Plaintiff's activities, any error was harmless because the ALJ provided other reasons for discounting Plaintiff's subjective complaints.").

Next, Jacquelyn L. argues that the ALJ's discussion of her COPD was erroneous because the ALJ found that Jacquelyn L. had "improvement" in her COPD and that it was relevant to the severity of Jacquelyn L.'s COPD that she continued to smoke cigarettes. This argument only has partial merit. The ALJ did not find that Jacquelyn L.'s COPD had improved, rather she merely found that the record did not support that Jacquelyn L.'s COPD caused disabling symptoms or significant examination deficits. *See* AR 1247–49 ("The claimant has COPD but is still able to smoke and does not consistently report disabling symptoms or demonstrate significant examination deficiencies."). Jacquelyn L. raises a valid criticism of the manner in which the ALJ discussed her smoking, however. Courts recognize that "people 'continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the

addictive nature of the product impacts their ability to stop'" and, for that reason, "a claimant's failure to quit smoking 'is an unreliable basis on which to rest a credibility determination.'" *Martinez v. Kijakazi*, 71 F.4th 1076, 1082–83 (7th Cir. 2023). It was improper for the ALJ to rely on Jacquelyn L. having continued smoking as part of her COPD analysis, especially without any explanation of how Jacquelyn L.'s continued smoking supported her conclusion that Jacquelyn L.'s COPD did not warrant further functional accommodations. *See id.*

Further, Jacquelyn L. claims that the ALJ's assessment of the severity of Jacquelyn L.'s diarrhea, neuropathy, depression, and cancer treatments was flawed. These again amount to requests for this Court to reweigh the evidence, which this Court cannot do. *See Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020) ("The court's role is not to reweigh evidence, but to determine whether the ALJ built an 'accurate and logical bridge' between the evidence and the conclusion."). The Court notes, however, that the ALJ did not adequately address Jacquelyn L.'s depression, a topic which the Court addresses at length below.

Jacquelyn L. also disagrees with the ALJ giving some weight to the notes in Jacquelyn L.'s medical records stating that Jacquelyn L. could perform light or sedentary work because the SSA's definition of light and sedentary work is likely different than a doctor's understanding of those terms. The ALJ expressly recognized this potential discrepancy in her opinion, and still found the medical treater's notes relevant to determining Jacquelyn L.'s RFC. AR 1249.

Next, the Court considers whether it was appropriate for the ALJ to find that Jacquelyn L. being the primary caregiver for her granddaughter supported that Jacquelyn L. could hold full-time employment. "The ability to care for children does not equate to the ability to work full-time outside the home." *Spaulding v. Astrue*, No. 11 C 2926, 2012 WL 3308881, at *4 (N.D. Ill. Aug. 13, 2012) (citing *Gentle v. Barnhart*, 430 F.3d 865, 867–68 (7th Cir. 2005)). Courts have

20

warned against the "casual equating of household work to work in the labor market." *Gentle*,

430 F.3d at 867. That does not mean that an ALJ cannot consider familial caregiving at all.

Rather, "[a]s we have said, it is proper for the Social Security Administration to consider a

claimant's daily activities in judging disability, but we have urged caution in equating these

activities with the challenges of daily employment in a competitive environment, especially

when the claimant is caring for a family member." *Beardsley v. Colvin*., 758 F.3d 834, 838 (7th

Cir. 2014).

In this case, the ALJ's consideration of Jacquelyn L.'s caregiving crossed the line into

reversible error. In considering Jacquelyn L.'s life activities outside of her medical care, the ALJ

stated that:

> She also delayed her cancer treatment in order to organize things
> for her granddaughter. November 2016 records reflected that she
> was caring for both of her granddaughters. September 2017 records
> reflected that [she] was the guardian for her 6-year-old grandchild.
> . . . April 2022 record reflected that she was doing well, she cared
> for her 11-year-old granddaughter, she was back working full time
> at a daycare. These activities are inconsistent with the claimant's
> alleged restricted functioning. Additionally, she testified that she is
> currently caring for her son in hospice care, which includes
> preparing meals, arranging transportation and appointments, and
> taking care of his shopping and medications.

AR 1248 (citations omitted). The ALJ's reasoning here is essentially a list of Jacquelyn L.'s

caregiving responsibilities over the years, and then a conclusion equating Jacquelyn L.'s

caregiving responsibilities with Jacquelyn L. not experiencing her alleged symptoms and being

capable of full-time work. The ALJ provides no analysis of how Jacquelyn L.'s caregiving was

inconsistent with her alleged symptoms or functional restrictions. This is reversible error in this

instance because this portion of the ALJ's analysis was a major component of her finding that

Jacquelyn L. was capable of full-time work and that the evidence did not support her alleged

symptoms. *See Francisco T. v. Bisignano*, No. 23 C 1481, 2025 WL 2324283, at *4–7 (N.D. Ill. Aug. 12, 2025) (N.D. Ill. Aug. 12, 2025) (reversing an ALJ's decision where the ALJ placed significant reliance on the plaintiff's ability to "be a stay-at-home dad" while not analyzing the actual amount of childcare the plaintiff was capable of providing, and without discussing other information on his daily functioning); *Senora W. v. O'Malley*, No. 21 C 4411, 2024 WL 4346613, at *12–13 (N.D. Ill. Sept. 30, 2024) (finding that an ALJ's assessment of a plaintiff's daily activities inadequate and not well supported where the ALJ found the plaintiff's testimony about taking care of her children inconsistent with her alleged limitations, where the record reflected that the plaintiff had some limitations, and the ALJ did not provide any analysis for her conclusion that caring for her children was inconsistent).

Finally, Jacquelyn L. argues that the ALJ misrepresents her work history because the ALJ mentions that Jacquelyn L. stopped working when her position was eliminated, but does not discuss that Jacquelyn L. worked in a number of temporary jobs after that time. Jacquelyn L. also argues that the ALJ should not have found that Jacquelyn L.'s return to work as a lunch lady in 2019 supported that Jacquelyn L. could perform full-time light or sedentary work because Jacquelyn L. only sought out that job due to financial necessity, as she had lost her savings to family financial troubles, and it was only part-time. The Court does not fault the ALJ for not discussing Jacquelyn L.'s temporary jobs following the end of her long stretch of employment, because the ALJ does not need to discuss all evidence in the record, and Jacquelyn L. has not shown how her holding some temporary jobs before her cancer diagnosis supports that she was not able to work during her cancer treatment. *See Warnell*, 97 F.4th at 1053 ("An ALJ need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning."). However, "the Seventh Circuit has

cautioned ALJs not to draw conclusions about a plaintiff's successful ability to work full time based on part-time employment." *Jonah D. v. Dudek*, No. 22 C 6460, 2025 WL 947892, at *4 (N.D. Ill. Mar. 28, 2025). In her opinion, the ALJ in a conclusory manner found that Jacquelyn L. "performing some type of work activity" during her treatment supported that she was not disabled, and that Jacquelyn L.'s work at her granddaughter's school contradicted her claims of functional limitations. AR 1248–49. The ALJ did not connect this conclusion to the facts with reasoning, thus rendering her determination improper. *See, e.g., Wendy S. v. Saul*, No. 18 C 1753, 2019 WL 2867199, at *8 (N.D. Ill. July 2, 2019) (finding that an ALJ erred in her analysis where she emphasized that a plaintiff was able to obtain a part-time job and stay in that job for some time, when that ALJ did not connect that part-time work with the available evidence showing that the plaintiff's conditions may have impacted her ability to obtain or maintain that job).

In sum, "[t]he Court will not nitpick the ALJ's decision so as to require perfect, as that is not the applicable standard." *Kristin S. B. v. Kijakazi*, No. 23 C 281, 2023 WL 6929583, at *6 (N.D. Ill. Oct. 19, 2023) (citations omitted). Here, however, the ALJ improperly equated Jacquelyn L. providing care to her granddaughter as her being capable of performing full-time employment and relied on Jacquelyn L.'s smoking as a reason for rejecting her alleged COPD challenges, and that cannot stand. *Gentle*, 430 F.3d at 867 (finding an ALJ's analysis deficient where they equated the plaintiff's ability to care for her children with her ability to hold full time employment); *Martinez*, 71 F.4th at 1082–83 ("[A] claimant's failure to quit smoking 'is an unreliable basis on which to rest a credibility determination.'"). For these reasons, the Court finds it necessary to remand this case for additional proceedings consistent with this Opinion.

## II. Medical Opinions

Jacquelyn L. additionally argues that the ALJ did not properly evaluate the medical opinions in the record because the ALJ did not give significant weight to any doctor's opinion on Jacquelyn L.'s cancer treatment, only gave little weight to Dr. Rao's opinion, and did not bridge the evidence and her conclusion. Jacquelyn L. also argues that the ALJ erred in affording significant weight to Dr. Hudspeth's opinion that Jacquelyn L.'s impairment was non-severe based on the evidence in the record.

The Court begins with the ALJ's opinion that Dr. Rao's opinion that Jacquelyn L. could not work full time was worth "no weight" and Dr. Rao's opinion that Jacquelyn L. could not return to work until at least September 2017 was worth "moderate weight" as to the topic of whether Jacquelyn L. was able to return to work as of September 2017. AR 1249–50. Because Jacquelyn L. filed her DIB claim before 2017, "the opinion of a treating physician is entitled to controlling weight if it is supported by sound medical evidence and is consistent with the record." *See Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (citing 20 C.F.R. § 404.1527(c)(2); *Reinaas v. Saul*, 953 F.3d 461, 465 (7th Cir. 2020)). "Thus, to the extent a treating physician's opinion is consistent with the relevant treatment notes and the claimant's testimony, it should form the basis for the ALJ's determination." *Bates*, 736 F.3d at 1100. If "well-supported contrary evidence is introduced, however, a treating physician's opinion becomes just another piece of evidence of the ALJ to evaluate." *Karr*, 989 F.3d at 511. Here, the ALJ provided an adequate explanation for giving no weight to Dr. Rao's opinion that Jacquelyn L. could not work, finding it inconsistent with Dr. Rao's own notes and assessment, which stated at some points during Jacquelyn L.'s cancer treatments that she could perform light or sedentary work based on her functionality, and other times found that she could not. *See, e.g.*, *Skarbek v.*

24

*Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (affirming an ALJ's rejection of a treater's medical opinion where the treater's notes did not support that opinion).

Next, the Court assesses Jacquelyn L.'s argument that the ALJ rejected all medical opinion evidence and did not adequately bridge her conclusion to evidence. In fact, the ALJ did not reject all medical opinion evidence, rather the ALJ afforded Dr. Kennedy's and Dr. Aquino's opinions "little weight" because they were issued before the development of further relevant facts; gave Dr. Hudspeth's opinion significant weight; and afforded parts of Dr. Rao's opinion moderate weight, while disregarding other parts. AR 1249-50. Further, the ALJ did mention Dr. Rao's treatment notes regarding Jacquelyn L. multiple times in her analysis and referred to other specific portions of Jacquelyn L.'s medical records. AR 1247–48. The ALJ built a logical bridge between the evidence and her conclusion, namely looking at the reports of Jacquelyn L.'s symptoms, treatment, and functionality reflected in her medical records and finding that Jacquelyn L.'s providers noted at multiple junctions that she was able to perform light or sedentary work. *Id.* The ALJ also grappled with contrary evidence in the record, noting that at times Jacquelyn L. reported neuropathy, dropping objects, diarrhea, but reconciling these issues with reports that she improved with treatment. *Id* at 1246–48. In sum, the ALJ accurately and logically explained why she assigned certain weights to certain medical opinions, and connected her conclusions regarding Jacquelyn L.'s functionality to medical evidence in the record, and the Court finds this is not a reversible error. *See Peeters*, 975 F.3d at 641 ("The court's role is not to reweigh evidence, but to determine whether the ALJ built an 'accurate and logical bridge' between the evidence and the conclusion.").

Finally, Jacquelyn L. argues that the ALJ erred in affording significant weight to Dr. Hudspeth's opinion that her mental limitations were not severe because the evidence indicates

25

her depression was severe and Dr. Hudspeth gave his opinion on her mental limitations before the records of home counseling were in the record or Jacquelyn L. testified about her mental health.  The Commissioner argues that Jacquelyn L. is simply asking the Court to reweigh the evidence.  However, the Commissioner misses half of Jacquelyn L.'s argument.  "An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion."  *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018).  The issue then becomes "whether the new information 'changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician and by evaluating himself the significance of [the subsequent] report."  *Kemplen v. Saul*, 844 F. App'x 883, 887 (7th Cir. 2021) (quoting *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016)).  Here, Dr. Hudspeth gave his opinion in March 2017, with access to some of Jacquelyn L.'s records concerning her depression, including that Dr. Rao prescribed Jacquelyn L. Wellbutrin.  AR 113.  Dr. Hudspeth did not have Jacquelyn L.'s testimony concerning her mental health or the notes of her counselors, Ms. Schwartz and Mr. Bueno.  AR 106–111.  Because the vast majority of the information about Jacquelyn L.'s depression is in Jacquelyn L.'s counseling notes, the ALJ erred in assessing that information without the aid of a medical expert.  *See, e.g.*, *Steven M. v. Comm'r of Soc. Sec. Admin.*, No. 23 C 3177, 2023 WL 8601526, at *4 (N.D. Ill. Dec. 12, 2023) (finding that an ALJ erred in assessing a substantial amount of the medical evidence on a topic without a medical expert and relying on a state agency consultant's opinion).  In sum, the Court finds it appropriate to remand the case for further proceedings because the ALJ improperly gave significant weight to a medical opinion that was outdated in light of subsequent evidence and improperly assessed that evidence herself.  *See Kemplen*, 844 F. App'x at 887 ("This court has stated repeatedly that an ALJ may

not 'play[] doctor and interpret new and potentially decisive medical evidence without medical scrutiny." (citation omitted)).

## III.    Mental Limitations

Finally, Jacquelyn L. argues that the ALJ failed to properly incorporate or address her mental limitations in the RFC finding.  In her RFC analysis, the ALJ discussed two mental health treaters' opinions of Jacquelyn L., Dr. Hudspeth and Mr. Bueno.  AR 1249–50.  The ALJ found Dr. Hudspeth's opinion that Jacquelyn L. did not have severe mental impairment to be worth significant weight because it was consistent with Jacquelyn L.'s significant functioning and "the absence of objective deficits other than her mood and the presence of some stressors that were not ongoing" such as that "the claimant served as the primary caregiver for her grandchild."  AR 1249.  The ALJ did not assign Mr. Bueno's opinion any weight because it did not include any functional limitations.  AR 1250.  The ALJ also noted that Jacquelyn L.'s "living situation was a stressor" and continued in a footnote that "[t]his stressor appears to have caused some depression but it appears episodic."  AR 1247.

A claimant's RFC represents the maximum she can do despite her limitations.  20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  An ALJ must base a claimant's RFC on all relevant evidence in the record, including the claimant's medical history and findings, the effects of treatment, reports of daily activities, and medical opinions.  20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *5.  When determining a claimant's RFC, an ALJ must consider all medically determinable impairments, including those that are not severe. *Craft*, 539 F.3d at 676.  An ALJ must also consider all the effects and limitations resulting from those impairments.  *See Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014) ("When determining an individual's RFC, the ALJ must consider all limitations that arise from medically

determinable impairments."); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("An ALJ must consider the combined effects of all of the claimant's impairments; even those that would not be considered severe in isolation.").

Before formulating the RFC, at step two of the total five-step SSA sequential analysis, an ALJ utilizes a special technique called the psychiatric review technique ("PRT") to determine the severity of any mental limitations. 20 C.F.R. § 404.1520a. Using the PRT, the ALJ assesses the claimant's function in four categories: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Id.* Although the ALJ's step two analysis is not an RFC finding, SSR 96-8p, 1996 WL 374184, at *4, if an ALJ finds mental impairments at step two, these should then be "reflected as limitations in the RFC finding." *Alesia v. Astrue*, 789 F. Supp. 2d 921, 933 (N.D. Ill. 2011); *see also Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014) ("As a general rule, . . . the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record."); *Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at *13 (N.D. Ill. Jan. 17, 2012) (finding ALJ erred in not including mild mental limitations he found at step two in his RFC analysis).

Here, using the PRT, the ALJ found that Jacquelyn L. had mild limitations in two out of the four categories, interacting with others, and adapting and managing oneself. AR 1243–44. Despite finding that Jacquelyn L. had mental limitations, the ALJ did not discuss how these limitations factored into Jacquelyn L.'s RFC, and whether any accommodations were necessary to address these limitations. Rather, the ALJ's references to Jacquelyn L.'s mental health in the RFC consisted of the ALJ's discussion of Jacquelyn L.'s stressors, observation that Jacquelyn L.'s depression appeared to be "episodic," giving weight to Dr. Hudspeth's opinion that

28

Jacquelyn L. was not severely mentally impaired, and rejecting Mr. Bueno's opinion for not containing functional information. AR 1247–50. These references to Jacquelyn L.'s mental health and mental health treaters were not sufficient because they did not involve any discussion of Jacquelyn L.'s mental limitations or how those limitations would impact her ability to perform work-related activities. *See Thomas G. v. Kijakazi*, No. 20 C 5860, 2022 WL 4234967, at *5 (N.D. Ill. Sept. 14, 2022) (finding that it was reversable error for an ALJ to merely find that state agency's determination that the claimant's mental limitations were not severe was persuasive and cite to her own step-two analysis of the claimant's mental limitations without more analysis in the RFC).

Further, the ALJ's failure to discuss Jacquelyn L.'s mild mental limitations appears particularly significant in this case because of the work the ALJ found Jacquelyn L. could perform. *See Colleen G. v. Kijakazi*, No. 23 C 0357, 2024 WL 216666, at *10 (N.D. Ill. Jan 19, 2024) (finding that the ALJ not addressing the claimant's mild mental limitations in the RFC was particularly significant where the ALJ found that plaintiff could do work involving interacting with others, where the claimant had a mild impairment in interacting with others); *Vandergraff v. Comm'r of Soc. Sec.*, No. 4:24-CV-44 JD, 2025 WL 2263127, at *6 (N.D. Ind. Aug 7, 2025) (explaining that the ALJ's failure to discuss the claimant's mild limitations in the RFC made the RFC assessment incomplete, particularly where the ALJ found the claimant could perform jobs directly involving the mild limitations). The ALJ specifically found that Jacquelyn L. could be a registration clerk, survey worker, child welfare case worker, and a case worker supervisor, jobs that involve significant interaction with others. *See* REGISTRATION CLERK (government ser.), Dictionary of Occupational Titles DOT (May 26, 2003), https://occupationalinfo.org/20/205367042.html; SURVEY WORKER (clerical), Dictionary of

Occupational Titles DOT (May 26, 2003), https://occupationalinfo.org/20/205367054.html; CASEWORKER, CHILD WELFARE (social ser.), Dictionary of Occupational Titles DOT (May 26, 2003), https://occupationalinfo.org/19/195107014.html; CASEWORK SUPERVISOR (social ser.), Dictionary of Occupational Titles DOT (May 26, 2003), https://occupationalinfo.org/19/195137010.html.  That the ALJ found in step two of her analysis that Jacquelyn L. had mild limitations in interacting with others, and then subsequently found Jacquelyn L. could perform jobs consisting primarily of interacting with others, without any discussion of Jacquelyn L.'s limitation constitutes a failure to logically bridge the evidence to the ALJ's conclusion.  *See Colleen*, 2024 WL 216666, at *10.

The Commissioner argues that the ALJ properly considered and analyzed the evidence regarding Jacquelyn L.'s depression, and concluded based on Dr. Hudspeth's opinion that Jacquelyn L.'s mental limitations did not result in any work-related functional loss.  However, the ALJ's opinion does not contain any such analysis of Jacquelyn L.'s work-related functions based on her mental limitations in the RFC assessment.  Much of the ALJ's reasoning that the Commissioner references is from her step-two analysis, which even the ALJ recognized was not an RFC assessment, a disclaimer courts routinely honor.  *See, e.g.*, *Rasima N. v. Kijakazi*, No. 21 C 2599, 2023 WL 6160181, at *3–4 (N.D. Ill. Sept. 21, 2023) (accumulating cases).  That the ALJ mentioned Jacquelyn L.'s depression and discussed whether she relied on some of Jacquelyn L.'s mental health treaters did not sufficiently incorporate Jacquelyn L.'s mild mental limitations into the RFC, because the ALJ did not explain how she reached her conclusion that Jacquelyn L.'s limitations did not impact her RFC.  *See Thomas G.*, 2022 WL 42349867, at *5 ("If the ALJ intended to incorporate restrictions caused by Claimant's mild mental limitations into the RFC, she was obligated to explain how she did so.  Conversely, if the ALJ believed that

the mild mental limitations did not merit a non-exertional limitation in the RFC, she was obligated to explain that conclusion.").  Similarly, while the end of the ALJ's step-two analysis states that "[t]he following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis," AR 1244, courts in this district have found this sort of language to be "boilerplate" and "insufficient to properly account for mild mental limitations without a more thorough discussion when crafting the RFC." *Mark M. v. Kijakazi*, No. 20 C 5063, 2022 WL 17960687 at *4 (N.D. Ill. 2022).

Next, the Commissioner argues that Jacquelyn L. did not identify which work-related functional limitations she possessed and prove those limitations with evidence.  However, this argument misses the point at this phase.  The ALJ already determined that Jacquelyn L. had presented sufficient evidence to show that she had mild mental functioning limitations in two of the four PRT categories.  AR 1243–44.  The Commissioner does not argue that this finding was erroneous.  After making that finding, the ALJ needs to account for those mental limitations in the RFC, and the Court cannot sufficiently determine based on the ALJ's opinion whether the ALJ did so in this case.  See *Paar*, 2012 WL 123596, at *13 ("The failure to consider the aggregate impact of both severe and non-severe impairments warrants reversal.").  Ultimately, the ALJ's failure to analyze Jacquelyn L.'s mental limitations in the RFC is an error necessitating remand.  *See, e.g.*, *Alesia*, 789 F. Supp. 2d at 933–34 (finding that where an ALJ did not include the claimant's mental functioning restrictions in the RFC finding, the ALJ committed reversable error).

## CONCLUSION

For the foregoing reasons, the Court reverses the ALJ's opinion and remands this case to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further

proceedings consistent with this Opinion.  The Court denies the Commissioner's motion for summary judgment [23].

Dated: September 24, 2025

_____
SARA L. ELLIS
United States District Judge